### In re ALL MAINE ASBESTOS LITIGATION.  (BIW Cases)

United States District Court,
D. Maine.

March 12, 1987.

---

Peter J. Rubin, Linda A. Monica, Bernstein, Shur, Sawyer & Nelson, Thomas R. McNaboe, Mark G. Furey, Thompson, McNaboe & Ashley, Portland, Me., for defendants.

Joseph Cox, Jr., JoAnn Bordeaux, Torts Branch, Civil Div., Washington, D.C., for U.S.

## SUPPLEMENTAL OPINION AND OR- DER ON THE UNITED STATES' AND DEFENDANTS' MOTIONS TO RECONSIDER

GIGNOUX, Senior District Judge.

In its Opinion and Order dated December 29, 1986, this Court denied the motion of the United States to dismiss, or for summary judgment on, that portion of Count VI of Model Third-Party Complaint A that asserts a contribution and indemnification claim against the United States based upon the provisions of Maine tort law. *See In re All Maine Asbestos Litigation (BIW Cases)*, 651 F.Supp. 913 (D.Me.1986). Defendant asbestos manufacturers have filed this complaint in all asbestos-related cases brought in this Court by present and former employees, and the representatives of deceased employees, of Bath Iron Works (BIW), a private shipyard located in Bath, Maine. In *All Maine Asbestos*, the Court concluded, in pertinent part, that during the period of time plaintiffs in these cases were employed at BIW (from approximately 1940 to approximately 1980), for the most part the United States "made discretionary decisions to place responsibility for maintaining a safe workplace on its contractor BIW" and that these decisions were protected by the discretionary function exception to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680(a) (1982). 651 F.Supp. at 921. Nevertheless, the Court held that summary judgment was inappropriate because issues of material fact existed "as to the discretion enjoyed by Navy personnel in implementing certain directives regarding asbestos precautions," *id.*, and "as to whether, when, and in what manner Navy inspectors sought to require BIW to implement asbestos safety precautions," *id.* at 925. Specifically, the Court found three items of evidence suggesting that the United States undertook to enforce compliance with asbestos safety standards

at BIW: NAVSHIPSINST 5100.26, an Instruction issued by the Naval Ship Systems Command (now known as NAVSEA) to Supervisor of Shipbuilding (SUPSHIP) personnel at BIW on February 9, 1971; a statement by BIW Vice President and Contract Administrator William F. Mussenden; and a statement by Captain Ronald B. Berklite, Director of SUPSHIP's Management Division. *Id.* at 22–24, 924–25.

The United States and defendants have both moved for reconsideration of the Court's December 29, 1986 decision. In support of its motion, the United States has submitted declarations of Mr. Mussenden; Captain E.S. Bailey, USN (Ret.), former SUPSHIP at BIW; and Richard D. Patterson, the Navy official in charge of the Navy's Occupational Safety and Health Program. The United States asserts that this newly-submitted evidence establishes the absence of any remaining issues of material fact as to the applicability of the discretionary function exception.

In opposition to the government's motion for reconsideration, defendants have submitted excerpts from the deposition testimony of Captain Charles L. Mull, USN (Ret.), who succeeded Captain Bailey as SUPSHIP at BIW, Captain Bailey, Mr. Patterson, and Mr. Mussenden, all taken in February 1987, and two SUPSHIP deficiency notices to BIW respectively dated May 28 and August 14, 1969. Defendants assert that this newly-submitted evidence demonstrates the existence of issues of material fact as to the applicability of the discretionary function exception. In their motion for reconsideration, defendants ask the Court "to reconsider or clarify certain aspects" of the Court's December 29, 1986 decision.[1]

The parties have briefed the issues, but have waived oral argument. The record before the Court consists of the supplementary materials addressing the applicability of the discretionary function exception to the FTCA that were submitted, pursuant to

the Court's request, prior to the Court's December 29, 1986 decision (four volumes marked respectively Government Exhibits A–D and Raymark Exhibit A), which the parties previously agreed constitute the relevant record; *see All Maine Asbestos,* 651 F.Supp. at 916; the three declarations submitted by the United States in support of its present motion, and the six documents filed by defendant Raymark in support of its objection to the government's present motion.

For the reasons to be stated, the United States' motion for reconsideration will be granted, the defendants' motion for reconsideration will be denied, and summary judgment will be entered dismissing that portion of Count VI of Model Third-Party Complaint A that asserts a contribution and indemnification claim against the United States based upon the provisions of Maine tort law. Because the Court has previously entered summary judgment dismissing all other claims for relief in Model Third-Party Complaint A, the motion of the United States for entry of final judgment dismissing the third-party complaints against the United States in these actions will be granted.

The Court will address in turn the motions of the United States and the defendants.

## I.

■ The United States' motion to reconsider asserts that no issues of material fact remain as to whether Navy personnel were charged with a nondiscretionary duty to implement certain safety directives or as to whether, when, and in what manner Navy inspectors sought to require BIW to implement asbestos safety precautions. The United States contends that the three declarations submitted in support of its motion establish that at no time and in no manner did Navy personnel have a nondiscretionary duty, nor did they actually seek, to

---

1. Purportedly acting pursuant to Local Rule 19(b)(2), defendant Raymark has filed with its objection to the United States' motion a "Statement of Disputed and Undisputed Facts Relevant to Discretionary Function Issues." This document does not comport with Local Rule 19 and, in any event, fails to establish the existence of any genuine issue of material fact. It can be accepted only as setting forth those facts which Raymark contends are disputed and undisputed.

require BIW to implement asbestos precautions. After reviewing these declarations along with the three items of evidence that the Court previously found to create issues of material fact, the Court agrees that these factual questions have been resolved.

The first item previously relied upon was NAVSHIPSINST 5100.26. The Instruction's purpose was "[t]o prescribe appropriate safety precautions during the use of asbestos"; SUPSHIP personnel at BIW forwarded a copy of the Instruction to BIW with the comment "for information." The Court found that an issue of material fact existed as to whether SUPSHIP personnel were under an operational, nondiscretionary duty immediately to implement the Instruction at BIW. 651 F.Supp. 924-25. But the declaration of Mr. Patterson, the NAVSEA official responsible for the development of Instructions such as NAVSHIPSINST 5100.26, states that such Instructions were never used or intended to be used

> by the Navy to compel action on the part of a private shipyard, or to pressure a Navy SUPSHIP into compelling any action on the part of a private shipyard. Such instructions are issued from one naval command to another naval command. Where circulated to a private shipyard, the copies of the instructions are issued for informational purposes in order to inform the shipyard of [NAVSEA] policy.

Patterson Declaration at 1-2. The declaration of Mr. Mussenden, Vice President and Contract Administrator at BIW from 1964 to 1982, confirms that correspondence forwarded from SUPSHIP to BIW with the notation "for information" "usually did not require adherence and implementation." Mussenden Declaration at 3. Defendants have submitted nothing to rebut these declarations or otherwise to establish that SUPSHIP personnel were under an operational, nondiscretionary duty to implement NAVSHIPSINST 5100.26 at BIW. Therefore, no issue of material fact remains on this question.

The second item previously relied upon was a 1981 statement by Mr. Mussenden

that "Navy inspectors make sure that we . . . follow precautionary measures in the area of asbestos. I know that." 651 F.Supp. at 925. But Mussenden now declares that:

> I do not recall today the basis for this statement. I am positive, however, that I did not mean by this statement that the contractual duties of the Navy and BIW changed regarding compliance with health and safety provisions of the contracts. During my tenure at BIW, government contracts placed the responsibility for compliance with such provisions on the contractor (BIW). *Compliance with regulations incorporated into contracts governing the use and handling of asbestos were handled no differently from other safety and health regulations.*

Mussenden Declaration at 2 (emphasis added). Capt. Bailey agrees in his declaration that "Navy inspectors audited BIW's compliance with contractual provisions governing the use or handling of asbestos no differently than they audited compliance with other health and safety provisions in the contracts." Bailey Declaration at 2. Thus, while Mussenden's previous statement raised an issue of material fact as to whether Navy personnel may actually have conducted inspections specifically aimed at requiring BIW to observe asbestos precautions, his new declaration and that of Capt. Bailey establish that no such specific inspections took place.

Defendants do not point to any evidence tending to rebut these assertions that asbestos was treated no differently from other health and safety problems. Instead, they renew their contention that issues of material fact exist as to whether Navy personnel enjoyed discretion in ensuring compliance with contractual health and safety requirements in general. They now rely on a 1972 Quality Assurance Supplement (QAS) to the Ship Acquisition Contract Administration Manual. *See* Defendants' Exhibit 3 to Bailey Deposition. The QAS established a detailed five-step procedure that, in defendants' view, Navy personnel had a nondiscretionary duty to follow in ensuring BIW's compliance with all

contractual requirements, including health and safety requirements.

A careful reading of the 1972 QAS, however, demonstrates that it is replete with language vesting government personnel with discretion to select particular areas in which to concentrate their quality assurance efforts and to select particular techniques for doing so. The QAS declared as the Navy's safety policy that "SUPSHIP shall, within the Contract provisions, monitor the Contractor's safety program using the applicable elements of the basis quality assurance program specified in paragraph 2–102." QAS ¶ 1–1201(b). Paragraph 2–102 listed these elements—Planning, Product Verification Inspection, Corrective Action, and so forth—and paragraph 2–103 explained how each related to the "General Application of [the] Program." Paragraph 2–103(a), for example, stated:

> Actions required to determine the Contractor's compliance with the contract quality requirements shall be systematically planned, *taking into consideration the relative importance of the product and the variety of tasks to be required of the available resources.*

(emphasis added). Paragraph 2–103(c) explained that "Product Verification Inspection will be applied *as necessary* to determine Contractor compliance" with contract requirements (emphasis added). Paragraph 2–104 added that SUPSHIPS should "develop, apply and maintain an *effective and efficient* quality assurance plan.... This plan will be augmented by detailed operating procedures, *where necessary.*" (emphasis added).

It is true that Paragraph 2–601(c) required government personnel to "request the Contractor to take corrective action *when any deficiency is found while performing*" inspections and other elements of the quality assurance program (empha-

sis added). Paragraph 2–602 established a detailed five-step procedure for requesting the contractor to take such corrective action. But nothing in this section on corrective action required government personnel actually to perform inspections or otherwise monitor compliance with contractual health and safety requirements. Instead, the detailed five-step procedure was triggered only *if* a deficiency was found while performing some *other* element of the quality assurance program.[2] And the clear language of the QAS vested government personnel with considerable discretion in setting overall priorities and allocating resources within the quality assurance program. Nothing in the QAS required government personnel to perform detailed, specific safety inspections without regard to their cost or relative importance. Because defendants offer no evidence tending to show the contrary, there is no remaining issue of material fact on this question; rather, it is now established that Navy personnel enjoyed discretion in ensuring compliance with contractual health and safety requirements at BIW.

The third item of evidence previously relied upon was a 1983 statement by Captain Berklite, at that time director of SUPSHIP's Management Division, to the effect that the SUPSHIP safety officer assigned to BIW since 1977 is "primarily concerned with the safety of government personnel and property [and] monitoring contractor performance of contract terms regarding safety and health." The Court previously viewed this statement as important because it was consistent with Mussenden's 1981 statement suggesting that government personnel actually performed inspections aimed at monitoring BIW's compliance with contractual asbestos safety requirements. 651 F.Supp. at 925. In light of Mussen-

---

**2.** Thus, for present purposes it is immaterial whether a Quality Deficiency Record (QDR) issued by the Navy to the contractor was merely informational or instead required immediate corrective action. There is not a shred of evidence that the Navy performed any inspection the results of which required the issuance of a QDR with respect to asbestos hazards, nor is there any evidence that such a QDR was ever issued. Similarly immaterial is the dispute over whether the Navy retained *authority* to stop work at BIW as an ultimate means of enforcing adherence to contractual quality standards or health and safety requirements. The question is whether the Navy had a nondiscretionary *duty* to stop work in such a situation; the answer is that it did not.

den's and Bailey's 1987 statements, unrebutted by defendants, Berklite's statement loses whatever probative value it formerly possessed on the question whether inspections actually occurred.

The Court previously concluded that, with the exception of the three items of evidence just discussed, there was no evidence that Navy personnel had a nondiscretionary duty to implement asbestos precautions and no evidence "as to the performance, nature, or results of actual inspections by Navy personnel." 651 F.Supp. at 925. The evidence newly submitted by the United States has explained those three items, and defendants have been unable to rebut these explanations. No issues of material fact remain and the United States is entitled to summary judgment unless the Court accepts the theories of liability advanced by defendants in support of their motion to reconsider. The Court therefore turns to an examination of that motion.

## II.

Defendants' motion to reconsider asserts that the Court has not adequately addressed defendants' theory that characterizes the completed naval vessels on which plaintiffs or their decedents performed repair work as "premises." Defendants allege that the United States as owner of those premises breached its duty to warn plaintiffs or their decedents of asbestos hazards hidden thereon.

■ Defendants argue that, even if the government made discretionary decisions not to enforce regulatory and contractual asbestos safety requirements, those decisions in no way encompassed a decision by the government not to perform its duty as premises owner to warn invitees of hazards hidden thereon. They appear to assert that in order for a government breach of a particular duty to be protected by the discretionary function exception, the government must make an explicit discretionary decision not to perform that particular duty. In defendants' view a discretionary government decision not to perform regulatory functions, or not to enforce contractual requirements, does not constitute a dis-

cretionary decision not to perform a particular duty imposed by state tort law.

Defendants ignore the teaching of *Shuman v. United States*, 765 F.2d 283 (1st Cir.1985). As this Court previously pointed out, 651 F.Supp. at 919–20, the district court in *Shuman* found the United States liable because it breached its duty as vessel owner to warn Shuman of the dangers of asbestos on board the vessels on which Shuman worked. The First Circuit reversed, finding the breach of that duty to be protected by the discretionary function exception, because "[t]he official policy at this time was not to regulate 'the conduct of private individuals' ... regarding the use of asbestos or other hazardous substances" at shipyards performing government contracts. *Shuman*, 765 F.2d at 292 (citation omitted). The First Circuit thus found that the government's discretionary decision not to regulate embraced a discretionary decision not to perform the government's duty as vessel owner. The government was not required to point to a specific decision not to perform its duty as vessel owner; a discretionary decision not to become involved in the minimization of occupational hazards faced by private shipyard workers was sufficient to bar liability for breach of the government's duty as vessel owner. In the instant cases, the government's asserted duty as premises owner is closely analogous to its duty as vessel owner. Therefore, the government's discretionary decisions to place primary responsibility for workplace safety on its contractor BIW encompassed discretionary decisions not to perform the government's duty as premises owner.

Defendants reply that the duty to warn invitees of hazards hidden on government premises has never been found discretionary. But the cases on which they rely all involved relatively unique, one-time hazards. *See Butler v. United States*, 726 F.2d 1057, 1063 (5th Cir.1984) (holding that failure to warn swimmers of hazard created by government dredging project was not protected by discretionary function exception); *United States v. White*, 211 F.2d 79, 82–83 (9th Cir.1954) (holding that fail-

ure to warn contractor's employees of hazard created by unexploded shells on government firing range was not protected by discretionary function exception); *Hernandez v. United States*, 112 F.Supp. 369 (D.Haw.1953) (holding that failure to warn motorists of hazard created by temporary roadblock was not protected by discretionary function exception). The failures to warn of these hazards are far closer to the "operational" end of the spectrum than are the United States' numerous considered decisions, made over the course of thirty-five years, relating to asbestos hazards at BIW and other shipyards. A case more on point is *Shuman*, which found the government's failure to warn of hazards hidden on its vessels to be protected by the discretionary function exception. *Shuman* thus refutes defendants' argument in a factual context closely related to the context of the instant cases.[3]

Defendants also seek reconsideration on the ground that the Court's previous decision does not address the government's liability for its asserted negligence in selecting specifications requiring the use of asbestos at BIW and in failing to give warnings or requiring safety precautions to remedy that negligence. But in all their memoranda to the Court, defendants have either failed to address the merits of this theory or have treated it as part of their theory that the government negligently ex-

ercised the control it retained over the work at BIW. The December 29, 1986 decision amply addressed the theory that the government failed to warn or require safety precautions, concluding that "for the most part the United States made discretionary decisions to place primary responsibility for maintaining a safe workplace on its contractor BIW." 651 F.Supp. at 921. The decision found irrelevant "the government's alleged retention of control over matters other than the safety of BIW employees." *Id.* at 921 n. 5.

■ To the extent that defendants now argue that the United States is liable solely because it selected specifications requiring the use of asbestos at BIW, rather than because it subsequently failed to warn or require safety precautions, this Court has no doubt that the selection of such specifications was discretionary. *See, e.g., Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967–68, 97 L.Ed. 1427 (1953) (holding that the discretionary function exception encompasses "determinations made by executives or administrators in establishing plans, specifications or schedules of operations."); *Alabama Electric Cooperative, Inc. v. United States*, 769 F.2d 1523, 1536–37 (11th Cir.1985) ("[W]here the [government] makes a social, economic or political policy decision concerning the design of a particular project, that decision is

---

**3.** Defendants argue that, whatever may have been the government's overall policy with respect to contract shipyard worker safety, the government actually had a policy to warn invitees of hazards hidden on its premises. Specifically, defendants rely on deposition testimony of Captain Mull to the effect that NAVSEA regulations in effect since 1948 required a ship's commanding officer, upon the ship's entering a shipyard, to advise invitees of significant dangers existing on board the ship. Mull Deposition at 54. But this in no way suggests that the commanding officer was required to warn shipyard workers of hazards created by the workers themselves during so-called "rip-outs" of asbestos.

Defendants also rely on deposition testimony of NAVSEA official Patterson that it was Navy policy to provide private shipyards with information about health hazards known to exist as part of the overhaul or construction of naval vessels. Patterson Deposition at 59. But Patterson was referring to NAVSEA's *present* policy;

NAVSEA was not created until 1974. And Patterson was careful to add that NAVSEA has "no discreet [*sic*] policy in any way, shape or form that I'm aware of that would deal with the entirety of all possible things with respect to safety and health hazards that are present or potential." *Id.* at 59–60. Thus, there is no evidence of a specific nondiscretionary duty to warn of all known hazards; NAVSEA clearly has discretion in determining whether, when, and in what manner to issue such warnings. Moreover, the reference to overhaul or construction makes clear that NAVSEA's policy with respect to health hazards encountered during vessel overhaul is the same as its policy with respect to those encountered during vessel construction. And defendants have been unable to point to any record evidence contradicting the government's assertion that neither NAVSEA nor any other government actor was charged with a nondiscretionary duty to warn of health hazards encountered during vessel construction.

excepted from judicial review under § 2680(a)."). Defendants have long been on notice that the government sought summary judgment on Count VI based on the discretionary function exception, yet despite numerous opportunities they have failed to identify any record evidence suggesting that the selection of specifications requiring the use of asbestos was not discretionary.

The Court has carefully considered defendants' other contentions and finds them to be without merit.

### III.

In accordance with the foregoing, it is ORDERED as follows:

(1) That the motion of the United States to dismiss, or for summary judgment on, that portion of Count VI of Model Third-Party Complaint A that asserts a contribution and indemnification claim against the United States based upon provisions of Maine tort law is GRANTED;

(2) That judgment be entered in each of these actions DISMISSING, with prejudice and with costs, the third-party complaints of defendants against the United States.